In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 21-3268
NELSON GARCIA, JR.,
 Petitioner-Appellee,
 v.

RANDALL HEPP,
 Respondent-Appellant.
 ____________________

 Appeal from the United States District Court for the
 Eastern District of Wisconsin.
 No. 20-cv-336 — Nancy Joseph, Magistrate Judge.
 ____________________

 ARGUED MAY 31, 2022 — DECIDED APRIL 25, 2023
 ____________________

 Before SCUDDER, ST. EVE, and KIRSCH, Circuit Judges.
 SCUDDER, Circuit Judge. Wisconsin police officers placed
Nelson Garcia in a lineup after a court commissioner found
probable cause for his arrest and set bail. Garcia did not have
counsel at the lineup. State prosecutors used the ensuing eye-
witness identification against Garcia in his trial for bank rob-
bery. The Wisconsin Court of Appeals affirmed Garcia’s con-
viction, determining that the state’s failure to appoint counsel
before the lineup did not violate his Sixth Amendment rights
2 No. 21-3268

because the right to counsel had not yet attached. Garcia then
sought federal habeas corpus relief under 28 U.S.C. § 2254,
which the district court granted.
 No doubt Congress intended and wrote the path to habeas
relief as narrow and demanding. But narrow does not mean
unavailable. The Wisconsin Court of Appeals’ resolution of
Garcia’s Sixth Amendment right-to-counsel claim falls within
the narrow class of objectively unreasonable state court deci-
sions warranting habeas relief. Even affording the Wisconsin
Court of Appeals the vast deference owed by § 2254(d)(1), we
see no reasonable way of squaring its decision with the Su-
preme Court’s long line of cases on the attachment of a de-
fendant’s right to counsel, including most recently in Rothgery
v. Gillespie County, 554 U.S. 191 (2008). We therefore affirm the
district court’s grant of habeas relief based on Garcia’s Sixth
Amendment right-to-counsel claim.
 I
 A
 In December 2011 a man entered a bank in Milwaukee and
handed the teller, D.L., a note stating that he was robbing the
bank. The teller turned over $3,500 in cash. The robbery was
caught on camera, and police released the video footage to the
media. Several tipsters identified Nelson Garcia as the robber.
The police arrested Garcia without a warrant on January 2,
2012.
 Two days later Detective Ralph Spano of the Milwaukee
Police Department appeared in court to submit a “Probable
Cause Statement and Judicial Determination” form, also
known as a CR-215 form, to a Milwaukee County court com-
missioner to establish a basis for Garcia’s continued
No. 21-3268 3

detention. The CR-215 form contains two sections. The section
for the “Probable Cause Statement” requires a statement of
facts establishing probable cause for continued detention. The
“Judicial Determination” section affords space for a court
official to determine probable cause and set bail. The form
also includes a distribution list that names the “Arrested
Person/Counsel” as a required recipient of the completed
form, along with the court, sheriff, and detention facility.
 Milwaukee County officials use the Wisconsin CR-215
form to satisfy the probable cause requirement for continued
detention following a warrantless arrest under Gerstein v.
Pugh, 420 U.S. 103 (1975), and County of Riverside v. McLaugh-
lin, 500 U.S. 44 (1991). The CR-215 form itself references the
Fourth Amendment and Wisconsin Statute § 970.01, “Initial
Appearance Before a Judge,” for its authority. In practice, the
form combines the Riverside probable cause determination
with the setting of bail. The form is normally executed in per-
son in a commissioner’s courtroom.
 In Garcia’s case, Detective Spano indicated on the CR-215
form that he had “probable cause to believe that [Garcia] com-
mitted” bank robbery and violated his parole. In his required
probable cause statement Detective Spano included a descrip-
tion of the surveillance footage and the multiple tips as the
basis for his belief. He then brought the CR-215 form to the
courthouse where a Milwaukee County court commissioner,
essentially a magistrate judge, made the requisite judicial de-
termination. The court commissioner checked a box on the
form stating: “I find probable cause to believe that the ar-
rested person committed the offense(s) as listed above,” and
set bail for Garcia at $50,000. Garcia remained in his jail cell
and was not present for the CR-215 determination.
4 No. 21-3268

 A few hours after the court commissioner made the prob-
able cause finding—and without appointing counsel for Gar-
cia—the police conducted an in-person lineup with D.L. and
a second teller. D.L. identified Garcia as the robber, stating
she was 100% certain in her identification. The second teller
did not make a positive identification.
 On January 7, 2012, three days after the lineup, Wisconsin
prosecutors filed a criminal complaint charging Garcia with
bank robbery. Garcia appeared in court later the same day
represented by a public defender and learned of the charges
against him. Ten days later Garcia appeared at a preliminary
hearing, where the trial court ordered him detained pending
trial.
 Garcia chose to go to trial and sought to represent himself.
The Milwaukee County judge denied that request, and the
trial ended in a guilty verdict, with the state having featured
D.L.’s eyewitness identification testimony. The trial judge
later sentenced Garcia to 15 years’ imprisonment.
 B
 Garcia appealed his conviction to the Wisconsin Court of
Appeals. Relying on the Supreme Court’s decision in Rothgery
v. Gillespie County, 554 U.S. 191 (2008), he argued his Sixth
Amendment right to counsel attached when the court com-
missioner found probable cause, set bail, and executed the
CR-215 form. Attachment at the CR-215 form’s execution,
Garcia continued, meant that the subsequent lineup was a
critical stage of the prosecution under United States v. Wade,
388 U.S. 218 (1967), triggering his Sixth Amendment right to
counsel. Garcia requested a new trial because the government
No. 21-3268 5

used the lineup evidence against him at trial in violation of
his Sixth Amendment right.
 The Wisconsin Court of Appeals rejected Garcia’s position
and affirmed his conviction. The court acknowledged the sim-
ilarities between Garcia’s case and Rothgery but distinguished
the two cases on a factual point—the defendant’s physical
presence at the probable-cause hearing. In Rothgery the de-
fendant was in the courtroom for the probable cause and bail
determination, whereas Garcia remained in jail and was not
in the courtroom when the court commissioner executed the
detective’s CR-215 form. The Wisconsin Court of Appeals also
noted that the CR-215 form did not expressly label Garcia’s
alleged conduct as a formal charge, whereas the state’s form
in Rothgery did. The Wisconsin Court of Appeals believed
these distinctions were conclusive and held that, under Roth-
gery, Garcia’s Sixth Amendment rights had not attached upon
execution of the CR-215 form. So no violation had occurred.
 On direct appeal, Garcia also pressed his contention that
the trial court violated his Sixth Amendment right to self-
representation by denying his request to represent himself at
trial. The Wisconsin Court of Appeals rejected this argument,
relying on the Supreme Court’s decision in Faretta v. Califor-
nia, 422 U.S. 806 (1975).
 Garcia then appealed to the Supreme Court of Wisconsin.
The court granted Garcia’s petition, and an evenly divided
court affirmed without an explanation of the merits.
 C
 With all avenues for relief in state court exhausted, Garcia
pursued habeas corpus relief in federal court. Invoking 28
U.S.C. § 2254(d)(1), he argued that the Wisconsin Court of
6 No. 21-3268

Appeals’ decision reflected an unreasonable application of
clearly established law regarding his Sixth Amendment
rights—specifically, the Supreme Court’s decisions in Roth-
gery, Wade, and Faretta. See Dassey v. Dittman, 877 F.3d 297,
302 (7th Cir. 2017) (en banc) (explaining that under § 2254,
federal courts review “the ‘last reasoned state-court decision’
to decide the merits” (quoting Johnson v. Williams, 568 U.S.
289, 297 & n.1 (2013))).
 The district court granted Garcia’s § 2254 petition, con-
cluding that the Wisconsin Court of Appeals unreasonably
applied both Rothgery and Faretta in affirming Garcia’s
conviction.
 The state now appeals the district court’s ruling.
 II
 A
 The Supreme Court has emphasized many times over that
Congress set the bar high for federal habeas petitioners. See
Harrington v. Richter, 562 U.S. 86, 102 (2011) (“If this standard
is difficult to meet, that is because it was meant to be.”). Con-
gress intended this deferential standard to be more than “or-
dinary error correction through appeal.” Id. at 102–03. By its
terms § 2254(d)(1) provides that federal courts “shall not”
grant relief unless the state court’s decision “was contrary to,
or involved an unreasonable application of, clearly estab-
lished Federal law, as determined by the Supreme Court of
the United States.” 28 U.S.C. § 2254(d)(1).
 Section 2254(d)(1)’s two clauses have independent mean-
ing. See Williams v. Taylor, 529 U.S. 362, 404 (2000). Under the
“contrary to” clause, a state court decision that “applies a rule
that contradicts the governing law set forth in” the Supreme
No. 21-3268 7

Court’s cases or “confronts a set of facts that is materially in-
distinguishable from a decision of th[e] Court but reaches a
different result” receives no deference. Brown v. Payton, 544
U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405).
 Under the “unreasonable application” clause, federal
courts also afford no deference to a state court decision when
“the state court applies [the Supreme] Court’s precedents to
the facts in an objectively unreasonable manner.” Id. Again,
the bar is high: to grant federal habeas relief, the state court’s
decision must be “so lacking in justification that there was an
error well understood and comprehended in existing law be-
yond any possibility for fairminded disagreement.” Harring-
ton, 562 U.S. at 103.
 Conducting the necessary and proper inquiries under
§ 2254(d)(1) requires us to identify the “clearly established
Federal law” to be applied. 28 U.S.C. § 2254(d)(1). This “stat-
utory phrase refers to the holdings … of [the Supreme]
Court’s decisions as of the time of the relevant state-court de-
cision.” Williams, 529 U.S. at 412. Of course, clearly established
law includes more than the four corners of a rule announced
in a single case. We consider all cases that “provide a body of
clearly established law” governing the issue. Sims v. Hyatte,
914 F.3d 1078, 1089 (7th Cir. 2019) (emphasis added) (discuss-
ing seven Supreme Court cases that clearly establish when the
prosecution must disclose material impeachment evidence);
see also Dassey, 877 F.3d at 303–05 (discussing the “Supreme
Court’s many cases applying the voluntariness test” that
make up the body of clearly established law regarding custo-
dial confessions).
8 No. 21-3268

 B
 In affirming Garcia’s conviction, the Wisconsin Court of
Appeals focused singularly on the Supreme Court’s decision
in Rothgery v. Gillespie County. Everyone agrees that Rothgery
is important. But Rothgery is by no means an isolated prece-
dent; nor did it announce a new rule. To the contrary, the
Court in Rothgery applied a longstanding body of clearly es-
tablished Sixth Amendment law to novel facts. Analyzing
Nelson Garcia’s case here is not as straightforward as reading
Rothgery and doing a side-by-side comparison. To understand
whether the Milwaukee police violated Garcia’s right to coun-
sel, we must, as the Court did in Rothgery, draw on the addi-
tional cases that constitute the greater body of Sixth Amend-
ment law. See Dassey, 877 F.3d at 304 (examining several
Supreme Court cases for a § 2254(d)(1) analysis where the
“Supreme Court precedents do not draw bright lines”). De-
termining the body of law to apply may end with Rothgery,
but it does not, as the Wisconsin Court of Appeals believed,
begin there.
 We start with the Constitution. The Sixth Amendment
guarantees that “[i]n all criminal prosecutions, the accused
shall … have the Assistance of Counsel for his defence.” U.S.
Const. amend. VI. The Supreme Court has announced princi-
ples to protect this right for at least 90 years, dating to its 1932
decision in Powell v. Alabama that the Sixth Amendment re-
quires indigent defendants accused of capital offenses to re-
ceive “the guiding hand of counsel at every step in the pro-
ceedings against him.” 287 U.S. 45, 69 (1932).
 The U.S. Reports contain many decisions identifying every
step of a criminal prosecution in which an accused receives
Sixth Amendment protection. The controlling inquiry comes
No. 21-3268 9

in two parts: attachment and critical stages. The “critical
stage” inquiry is normally the second step of a court’s
analysis, but we briefly address it first because it is not at issue
here. In United States v. Wade, the Court read “the Sixth
Amendment guarantee to apply to ‘critical’ stages of the pro-
ceedings” because of the Amendment’s express guarantee of
counsel for a criminal defendant’s “defence.” 388 U.S. at 224–
25 (emphasis in original). In Billy Joe Wade’s case, the Court
held that his post-indictment, pretrial lineup was a critical
stage requiring counsel. See id. at 237. Ditto here: everyone
agrees that Garcia’s in-person lineup was a critical stage un-
der Wade.
 The main point of contention is instead over “attachment.”
Before concluding that a defendant has a right to counsel at a
critical stage, a court must also find that the criminal prosecu-
tion has commenced. See Kirby v. Illinois, 406 U.S. 682, 688
(1972) (plurality opinion). Here, if Garcia’s right did not at-
tach at the CR-215 hearing, he would not have been guaran-
teed the right to counsel at the lineup even though it would
be a critical stage under Wade. Indeed, for the last 50 years the
Supreme Court has highlighted the “firmly established” rule
that the Sixth Amendment right to counsel “attaches only at
or after the time that adversary judicial proceedings have
been initiated against [the accused].” Id. (citing Powell, 287
U.S. 45).
 Kirby distinguished the state’s criminal judicial proceed-
ings from “routine police investigation,” the latter of which
does not receive the same “absolute constitutional guarantee”
of counsel. Id. at 690. The Court emphasized that the line di-
viding routine pre-prosecution investigation from adversarial
prosecutorial proceedings was “far from a mere formalism”
10 No. 21-3268

and indeed was central to Sixth Amendment protections, es-
pecially given the vast state-by-state variation in criminal pro-
ceedings. Id. at 689. The Court took great care to emphasize
the substantive importance of the attachment inquiry:
 It is the starting point of our whole system of
 adversary criminal justice. For it is only then
 that the government has committed itself to
 prosecute, and only then that the adverse posi-
 tions of government and defendant have solidi-
 fied. It is then that a defendant finds himself
 faced with the prosecutorial forces of organized
 society, and immersed in the intricacies of sub-
 stantive and procedural criminal law. It is this
 point, therefore, that marks the commencement
 of the ‘criminal prosecutions’ to which alone the
 explicit guarantees of the Sixth Amendment are
 applicable.
Id. at 689–90.
 Kirby’s reasoning echoes throughout the Court’s later
opinions identifying other pretrial confrontations that mark
the commencement of criminal prosecutions. The Court has
underscored time and again that the focus of the Sixth
Amendment attachment inquiry is on the actions of the state,
not the accused. See Brewer v. Williams, 430 U.S. 387, 401 (1977)
(reaffirming that the Sixth Amendment right to counsel at-
taches once adversary proceedings have commenced); United
States v. Gouveia, 467 U.S. 180, 188–89 (1984) (emphasizing the
same point); Moran v. Burbine, 475 U.S. 412, 430 (1986) (same);
Michigan v. Jackson, 475 U.S. 625, 632 (1986) (same); McNeil v.
Wisconsin, 501 U.S. 171, 181 (1991) (same).
No. 21-3268 11

 C
 Fast forward several decades to 2008, and we come to the
Supreme Court’s consideration of Sixth Amendment attach-
ment in Rothgery. The Court granted review to answer
whether the Fifth Circuit correctly held “that adversary judi-
cial proceedings [ ] had not commenced, and petitioner’s
Sixth Amendment rights had not attached, because no prose-
cutor was involved in petitioner’s arrest or appearance before
the magistrate.” Petition for Writ of Certiorari at i, Rothgery,
554 U.S. 191 (No. 07-440). Front and center in the Court’s
analysis was Kirby’s rule that a “criminal prosecution” is the
“point at which ‘the government has committed itself to pros-
ecute.’” Rothgery, 554 U.S. at 198 (quoting Kirby, 406 U.S. at
689 (plurality opinion)). The Court sought to determine
whether the Texas proceedings “mark[ed] that point,”
thereby triggering “the consequent state obligation to appoint
counsel.” Id.
 The question arose from facts similar to Garcia’s case.
Texas law creates a procedure that “combines the Fourth
Amendment’s required probable-cause determination with
the setting of bail” for arrestees who had been detained with-
out a warrant. Id. at 195. Police had arrested Walter Rothgery
without a warrant after an erroneous database search sug-
gested he was a felon in possession of a firearm. Soon after the
initial detention, the arresting officer filed an affidavit of
probable cause that described the facts supporting probable
cause for the arrest. Upon reviewing the affidavit and con-
cluding there was probable cause, “the magistrate informed
Rothgery of the accusation, set his bail at $5,000, and commit-
ted him to jail.” Id. at 196. No state prosecutors were present
or aware of the magistrate’s actions against Rothgery—just
12 No. 21-3268

the police officer, magistrate, and Rothgery were there. The
case was dismissed six months later when Rothgery’s as-
signed counsel helped him prove that he had never been con-
victed of a felony. See id. at 196–97.
 Rothgery then invoked 42 U.S.C. § 1983 and filed suit
against the Texas county in federal court alleging that he
would not have been indicted, rearrested, or jailed for three
weeks if the court had appointed a lawyer soon after the
probable-cause hearing. See id. at 197. The Fifth Circuit af-
firmed the district court’s entry of summary judgment for the
county, agreeing that Rothgery’s Sixth Amendment right to
counsel did not attach when the magistrate executed the prob-
able cause and bail determination form. The Fifth Circuit saw
the prosecutor’s absence as a factual distinction that prior
cases never addressed. The court interpreted the Supreme
Court’s silence as “neutral[ity] on the point,” id. at 205, and
concluded that the right to counsel had not attached because
“the relevant prosecutors were not aware of or involved in
Rothgery’s arrest or appearance before the magistrate,” un-
like in the Court’s prior cases. Id. at 197.
 The Supreme Court reversed. The Court held that the Fifth
Circuit erred in its narrow focus “on the activities and
knowledge of a particular state official” over a broader “fo-
cus[ ] on the start of adversarial judicial proceedings.” Id. at
198–99. The Court explained that its prior silence on the issue
of a prosecutor’s presence demonstrated that fact’s lack of rel-
evance to the Sixth Amendment’s guarantees and not, as the
Fifth Circuit believed, the Court’s endorsement of its im-
portance or even neutrality. Id. at 206 (“Neither Brewer nor
Jackson said a word about the prosecutor’s involvement as a
relevant fact, much less a controlling one.”). Rather, the Court
No. 21-3268 13

continued, “what counts as a commitment to prosecute is an
issue of federal law unaffected by allocations of power among
state officials under a State’s law.” Id. at 207.
 The Court drew on its body of Sixth Amendment law to
reemphasize that what controls are the recognized indicators
of the government’s “commitment to prosecute.” A prosecu-
tor’s presence had never been recognized as such a litmus test.
Indeed, adopting a rule that turns on the presence or absence
of state officials, the Court cautioned, “would have the prac-
tical effect of resting attachment on such absurd distinctions
as the day of the month an arrest is made.” Id. at 206. So ele-
vating form over substance would invite states to gerryman-
der pretrial proceedings in an attempt to escape the clear
holdings of the Supreme Court’s precedents and deny crimi-
nal defendants the benefits of their constitutional rights.
 In holding that right-to-counsel attachment did not turn
on the presence of a prosecutor, Rothgery’s reasoning hewed
closely to Kirby, Brewer, Jackson, and the other Sixth Amend-
ment cases that came before it. It is impossible to miss the
Court’s diligent and thorough invocation of these exact cases
in its explanation of the Sixth Amendment’s commitment to
substance over form:
 [U]nder the federal standard [for attachment of
 the Sixth Amendment right to counsel], an ac-
 cusation filed with a judicial officer is suffi-
 ciently formal, and the government’s commit-
 ment to prosecute it sufficiently concrete, when
 the accusation prompts arraignment and re-
 strictions on the accused’s liberty to facilitate
 the prosecution, see Jackson, 475 U.S. at 629, n. 3;
 Brewer, 430 U.S. at 399; Kirby, [406 U.S.] at 689
14 No. 21-3268

 (plurality opinion); see also n. 9, supra, at [199].
 From that point on, the defendant is “faced with
 the prosecutorial forces of organized society,
 and immersed in the intricacies of substantive
 and procedural criminal law” that define his ca-
 pacity and control his actual ability to defend
 himself against a formal accusation that he is a
 criminal. Kirby, [406 U.S.] at 689 (plurality opin-
 ion). By that point, it is too late to wonder
 whether he is “accused” within the meaning of
 the Sixth Amendment, and it makes no practical
 sense to deny it. See Grano, Rhode Island v. In-
 nis: A Need to Reconsider the Constitutional Prem-
 ises Underlying the Law of Confessions, 17 Am.
 Crim. L.Rev. 1, 31 (1979) …. All of this is equally
 true whether the machinery of prosecution was
 turned on by the local police or the state attor-
 ney general.
Rothgery, 554 U.S. at 207–08.
 Examining the Court’s Sixth Amendment jurisprudence—
from its beginnings in Powell, through its applications in
Kirby, Brewer, Gouveia, Burbine, Jackson, and McNeil, to its end-
ing with the on-point application in Rothgery—shows that
Rothgery itself did not announce a new rule of right-to-counsel
attachment that directly resolves Garcia’s case. Quite the op-
posite. Rothgery instead clarified that a state government’s
commitment to prosecute does not turn on the presence of a
state prosecutor—a conclusion flowing directly from the
clearly established rule that the Sixth Amendment right to
counsel attaches once the government’s actions have set the
wheels of judicial machinery in motion.
No. 21-3268 15

 D
 That returns us to Garcia’s case. Applying the clearly es-
tablished legal principles reiterated in Rothgery compels the
conclusion that Garcia’s Sixth Amendment right to counsel
attached when the Milwaukee County court commissioner
appeared in court and executed the CR-215 form.
 The Texas procedure in Rothgery is identical to that used
by Milwaukee County, except that Walter Rothgery was pre-
sent in the courtroom for his hearing and Nelson Garcia was
not. But this distinction alone cannot be enough to conclude
that the Sixth Amendment right did not attach. Remember
that one of the important lessons from Rothgery itself is that
the Supreme Court’s silence regarding certain facts, such as a
prosecutor’s presence, is not an invitation to distinguish a
novel case without regard for broader principles. Nowhere in
its lengthy articulation of the federal standard for attachment
did the Court mention, let alone emphasize, the defendant’s
physical presence at the probable-cause proceeding. Nor can
any reference to the defendant’s presence be found in the
Court’s concise restatement of the legal rule: “Attachment oc-
curs when the government has used the judicial machinery to
signal a commitment to prosecute as spelled out in Brewer and
Jackson.” Id. at 211–12.
 All relevant facts show the state signaled its commitment
to prosecute Garcia with the filing of the CR-215: the detective
brought the form accusing Garcia of robbery to the commis-
sioner’s courtroom, the commissioner found probable cause
for Garcia’s continued detention based on the detective’s
statement, and the commissioner set Garcia’s bail at $50,000,
thereby restricting his liberty beyond mere arrest. Though it
is unclear whether Garcia ever received a copy of the CR-215
16 No. 21-3268

form, he should have. State law directed the county to inform
Garcia of the accusations against him, as spelled out on the
CR-215 form itself.
 To our eye, these are the exact indicators the Supreme
Court has identified as evincing a state’s formal commitment
to prosecute, none of which turns on Garcia’s presence in the
courtroom. The accusation filed with the court commissioner
was “sufficiently formal,” the county’s commitment to prose-
cute “sufficiently concrete,” and the commissioner’s finding
enough to “prompt[ ] restrictions on [Garcia’s] liberty.” Id. at
207. By the time the court commissioner found probable cause
to continue Garcia’s detention and set bail, “it [was] too late
to wonder whether [Garcia was] ‘accused’ within the mean-
ing of the Sixth Amendment.” Id. “What counts is that the
complaint filed with the magistrate accused [Garcia] of com-
mitting a particular crime and prompted the judicial officer to
take legal action in response (here, to set the terms of bail and
order [Garcia] locked up).” Id. at 199 n.9. From that point for-
ward, Garcia shifted from an investigated party to an accused.
And that practical reality had a legal consequence: the Sixth
Amendment’s guarantees necessarily kicked in.
 The Wisconsin Court of Appeals committed error in hold-
ing otherwise. And under § 2254(d)(1), we go one step further
and conclude that this incorrect holding was also an unrea-
sonable one. The state court’s focus on Garcia’s absence from
the CR-215 hearing was so far afield from the Court’s clearly
established Sixth Amendment precedents that its holding is
wrong beyond “fairminded disagreement.” Harrington, 562
U.S. at 103.
 The Wisconsin Court of Appeals too narrowly distin-
guished Garcia’s case from Rothgery without engaging with
No. 21-3268 17

the clearly established body of Sixth Amendment law of
which Rothgery is a part. The Wisconsin court incorrectly
rested its decision on a mere factual distinction while over-
looking the clearly established legal rule directed at other as-
pects of the CR-215 proceeding. Though Garcia’s absence
from the courtroom during the CR-215 hearing was certainly
a “new factual permutation[ ],” it was a difference small
enough to leave “the necessity to apply the earlier rule … be-
yond doubt.” White v. Woodall, 572 U.S. 415, 427 (2014) (quot-
ing Yarborough v. Alvarado, 541 U.S. 652, 666 (2004)). The Wis-
consin Court of Appeals failed to fully consider the clearly es-
tablished rule that attachment occurs at the initiation of “ad-
versarial judicial proceedings,” Rothgery, 554 U.S. at 198–99,
and this error led to the court’s incorrect and unreasonable
conclusion.
 However you state the legal test for attachment, Milwau-
kee’s CR-215 hearing fits the bill. Regardless of Garcia’s ab-
sence from the courtroom, the commissioner’s execution of
the CR-215 form constituted “the first formal proceeding
against [him as] an accused.” McNeil, 501 U.S. at 181. Nor
could the execution of the form be called anything other than
an “adversary judicial proceeding[ ]” against Garcia, espe-
cially given the detective’s delivery and presentation of the
form to the commissioner in his courtroom. Gouveia, 467 U.S.
at 188–89; Brewer, 430 U.S. at 401. By the time the court com-
missioner made a judicial determination of probable cause
and set the terms of Garcia’s bail, it had become clear both
that “the government’s role [had] shift[ed] from investigation
to accusation,” Burbine, 475 U.S. at 430, and that Garcia, who
“had previously been just a ‘suspect,’” was now “an ‘accused’
within the meaning of the Sixth Amendment.” Jackson, 475
U.S. at 632. From that point on, Garcia found himself “faced
18 No. 21-3268

with the prosecutorial forces of organized society, and im-
mersed in the intricacies of substantive and procedural crim-
inal law.” Kirby, 406 U.S. at 689 (plurality opinion).
 Under the long line of Sixth Amendment cases—all of
which reinforces a clearly established legal rule—we are una-
ble to view the CR-215 hearing as reflecting anything other
than a decision by the state of Wisconsin to set its “judicial
machinery” in motion against Garcia. Rothgery, 554 U.S. at
211. It is of no Sixth Amendment consequence that Garcia
never appeared in court during the CR-215 proceeding. If we
were to conclude that the Wisconsin Court of Appeals’ deci-
sion was reasonable because of that factual distinction alone,
we would risk hollowing § 2254(d)(1).
 Remember, too, that § 2254(d)(1)’s two clauses have inde-
pendent meaning. See Williams, 529 U.S. at 404. When the facts
are not identical to precedent, as in Garcia’s case,
§ 2254(d)(1)’s “contrary to” clause is not at issue—we analyze
only whether there was an “unreasonable application.” But if
any factual distinction sufficed to affirm a lower court’s judg-
ment as one that is not “unreasonable,” then courts applying
clearly established laws to new sets of facts would never sat-
isfy the “unreasonable application” clause. Such a conclusion
would render the “unreasonable application” clause alto-
gether redundant.
 The “unreasonable application” clause of § 2254(d)(1) is
demanding, but it is not an empty set. Meeting its stringent
requirement involves exactly what we have done here—tak-
ing a close look at the manner in which a state court applied
the Supreme Court’s clearly established law. In Garcia’s case,
the Wisconsin Court of Appeals based its conclusion on im-
material factual distinctions and lost sight of at least 50 years
No. 21-3268 19

of Supreme Court precedent instructing courts to examine the
steps that the government has taken toward adversarial pros-
ecutorial proceedings. See Rothgery, 554 U.S. at 207 (citing
Jackson, 475 U.S. at 629 & n.3; Brewer, 430 U.S. at 399; and Kirby,
406 U.S. at 689 (plurality opinion)).
 Our conclusion about Wisconsin’s CR-215 proceeding is
not isolated. Three federal judges in Wisconsin with no in-
volvement in this case have reached the conclusion that we
believe is compelled by the clearly established body of Sixth
Amendment law—that the Sixth Amendment right to counsel
attaches at the CR-215 hearing. The first judge to review the
issue, shortly after the Court decided Rothgery, put it best:
 A conclusion regarding a defendant’s Sixth
 Amendment right to counsel based on form, i.e.
 the physical appearance before a judicial officer,
 rather than substance, i.e. a judicial officer find-
 ing probable cause, fixing bail, and the arrestee
 being informed of the preliminary charges
 against him, would lay the groundwork for ab-
 surd results that are antithetical to constitu-
 tional aims. … [I]t is these events that are most
 crucial to the constitutional calculus and not the
 means by which these actions were completed.
 It is this utilization of the “judicial machinery”
 that signals a commitment to prosecute and
 thus triggers an arrestee’s right to counsel under
 the Sixth Amendment. [Rothgery, 554 U.S. at
 211].

United States v. West, No. 08-CR-157, 2009 WL 5217976, *9
(E.D. Wis. Mar. 3, 2009) (Goodstein, Mag. J.). See also Jackson
20 No. 21-3268

v. Devalkenaere, No. 18-CV-446, 2019 WL 4415719, *3 & n.1
(E.D. Wis. Sept. 16, 2019) (Stadtmueller, J.); United States v.
Mitchell, No. 15-CR-47, 2015 WL 5513075, *3–4 (E.D. Wis. Sept.
17, 2015) (Adelman, J.).
 And here, too, the district court in this very case reached a
conclusion aligned with today’s holding not only on the mer-
its, but under § 2254(d)(1)’s demanding standard. In granting
Garcia’s petition, the district court observed that “[t]he Roth-
gery Court did not create a rule where a defendant’s constitu-
tional rights vary from jurisdiction to jurisdiction based upon
the state’s individual procedures.” Garcia v. Foster, 570 F.
Supp. 3d 659, 666 (E.D. Wis. 2021) (Joseph, Mag. J.). The dis-
trict court correctly focused on substance over form. Apply-
ing not just Rothgery’s holding but the legal underpinnings
supporting its outcome, the district court concluded that
“[g]iven the functional equivalence of the Texas procedure
and the Milwaukee County procedure acknowledged by the
Wisconsin Court of Appeals, it was unreasonable for the Wis-
consin Court of Appeals to determine that one triggered the
right to counsel while the other did not.” Id. We agree.
 III
 We end where everything began. Milwaukee police ar-
rested Nelson Garcia without a warrant and detained him.
Garcia remained in jail when the police went to the county
courthouse two days later to make their case against him in
front of a court commissioner—a state official empowered to
make judicial findings in response to criminal allegations. The
commissioner then exercised that power by executing a form,
provided by state law, that accused Garcia of the bank rob-
bery, established probable cause for his continued detention,
and set his bail. A few hours later, police took Garcia to a
No. 21-3268 21

lineup without counsel, where the bank teller positively iden-
tified him as the robber. The state then used this evidence
against Garcia at trial.
 The judicial machinery of the state’s adversarial process
necessarily began to turn against Garcia after the court com-
missioner executed the CR-215 form. The state’s failure to ap-
point counsel for the lineup therefore violated Garcia’s Sixth
Amendment rights. The state cannot escape the Sixth Amend-
ment’s requirements by keeping arrestees in jail while taking
formal actions toward prosecution. The Wisconsin Court of
Appeals unreasonably concluded otherwise.
 Because we grant Garcia’s petition on these grounds, we
do not reach his Sixth Amendment claim to self-representa-
tion under Faretta. We AFFIRM the district court’s decision to
grant Garcia’s petition for habeas relief.
22 No. 21-3268

 KIRSCH, Circuit Judge, dissenting. The majority oﬀers com-
pelling arguments about how to understand Rothgery v. Gil-
lespie County, 554 U.S. 191 (2008). I disagree, however, with its
application of the highly deferential standard that federal
courts apply when reviewing state court decisions under
28 U.S.C. § 2254(d)(1). In my view, the Wisconsin Court of
Appeals’ decision was not “so lacking in justiﬁcation that
there was an error well understood and comprehended in ex-
isting law beyond any possibility for fairminded disagree-
ment.” Harrington v. Richter, 562 U.S. 86, 103 (2011). With re-
spect, I dissent.
 Nelson Garcia wasn’t there when a county commissioner
completed a CR-215 form two days after his warrantless ar-
rest. The commissioner determined there was probable cause
for Garcia’s arrest and set bail. Shortly after the form was com-
pleted, Garcia was placed in a lineup. Had the lineup oc-
curred before the CR-215 form was completed, Garcia would
have no Sixth Amendment claim to bring. And had Garcia
been present when the CR-215 form was completed, there
would be no daylight between this case and Rothgery. But
these are not the facts. Rothgery was present for his proceed-
ing; Garcia was not. Given Rothgery’s repeated use of “initial
appearance,” I cannot conclude that the Wisconsin Court of
Appeals was objectively unreasonable—that no fairminded
jurist could agree with its determination—for concluding that
following a warrantless arrest, a defendant’s appearance be-
fore a neutral magistrate is a prerequisite to the attachment of
the Sixth Amendment right to counsel.
 Individuals can be arrested with or without a warrant.
In County of Riverside v. McLaughlin, 500 U.S. 44 (1991), the Su-
preme Court held that individuals arrested without a warrant
No. 21-3268 23

are entitled to judicial review of their arrest within 48 hours.
Wisconsin created the CR-215 form to satisfy Riverside’s re-
quirements. In a CR-215 proceeding, the arresting oﬃcer
hands the form to a county commissioner (in eﬀect, a magis-
trate judge), who reviews the oﬃcer’s aﬃdavit and deter-
mines whether probable cause exists to continue detaining the
defendant. Milwaukee County, where Garcia was arrested,
conducts the CR-215 proceeding without the defendant. Alt-
hough the Supreme Court has never said so, Wisconsin’s Su-
preme Court has held that a defendant need not be present at
his Riverside hearing. State v. Koch, 499 N.W.2d 152, 160 (Wis.
1993).
 If the CR-215 proceeding only determined probable cause,
a defendant’s presence would be immaterial. The Supreme
Court has never held that a Riverside hearing triggers the right
to counsel. Yet the CR-215 proceeding does more than just de-
termine probable cause: it sets bail.
 Wisconsin statutes provide that “[b]ail may be imposed at
or after the initial appearance only upon a ﬁnding by the court
that there is a reasonable basis to believe that bail is necessary
to assure appearance in court.” Wis. Stat. § 969.01(1) (empha-
sis added). Wisconsin also, like many states, authorizes bail to
be set before a defendant is arrested. Wis. Stat. § 969.05(2)
(“The amount and method of posting bail may be endorsed
upon felony warrants.”). But nowhere in Wisconsin statutes
is there authority to impose bail before an “initial appear-
ance” except upon a warrant. See generally Wis. Stat. § 969.
 One would be forgiven for thinking that, since the CR-215
proceeding sets bail after a defendant’s arrest, then it must be
“the initial appearance.” But “initial appearance” is a term of
art in Wisconsin. See Wis. Stat. § 970.01−.02. “Any person who
24 No. 21-3268

is arrested shall be taken within a reasonable time before a
judge in the county in which the oﬀense was alleged to have
been committed” for his “initial appearance.” § 970.01(1). “At
the initial appearance the judge shall inform the defendant”
of “the charge against the defendant” and of “his or her right
to counsel,” “shall furnish the defendant with a copy of the
complaint,” and “shall admit the defendant to bail.”
§ 970.02(1)−(2). Garcia’s “initial appearance,” as Wisconsin
uses the term, happened ﬁve days after the CR-215 proceed-
ing and was the ﬁrst time he appeared before a magistrate.
 Of course, no one contends that the Supreme Court’s use
of “initial appearance” in Rothgery meant the procedure out-
lined in Wisconsin law. A defendant present at his CR-215
proceeding has had an initial appearance as Rothgery uses the
term because he has had his ﬁrst appearance before a judicial
oﬃcer. Rothgery, 554 U.S. at 199 (“Texas’s article 15.17 hearing
is an initial appearance: Rothgery was taken before a magistrate,
informed of the formal accusation against him, and sent to jail
until he posted bail.”) (emphases added). But Garcia was not
brought before a judicial oﬃcer before the lineup at issue
here. As a result, the Wisconsin Court of Appeals seized upon
Rothgery’s repeated use of “initial appearance” or its equiva-
lent to determine that Garcia’s absence from the CR-215 pro-
ceeding meant that his right to counsel did not attach at that
proceeding. That conclusion was not unreasonable.
 Time and again, Rothgery uses language like “initial ap-
pearance,” “ﬁrst appearance,” and “before a judge.” Roth-
gery’s opening line sets the scene: “This Court has held that
the right to counsel guaranteed by the Sixth Amendment ap-
plies at the ﬁrst appearance before a judicial oﬃcer at which a de-
fendant is told of the formal accusation against him and
No. 21-3268 25

restrictions are imposed on his liberty.” 554 U.S. at 194 (em-
phasis added). And the Court concludes: “Our holding is nar-
row. … We merely reaﬃrm what we have held before and
what an overwhelming majority of American jurisdictions
understand in practice: a criminal defendant’s initial appearance
before a judicial oﬃcer, where he learns the charge against him
and his liberty is subject to restriction, marks the start of ad-
versary judicial proceedings that trigger attachment of the
Sixth Amendment right to counsel.” Id. at 213 (emphasis
added).
 In all, Rothgery uses “initial appearance” and its cognates
more than 25 times. And it does so not merely in passing, but
in critical portions of its analysis. Take Rothgery’s description
of Brewer v. Williams, 430 U.S. 387 (1977), one of the seminal
cases on the attachment of the right to counsel: “the Court
nevertheless held that the defendant’s right had clearly at-
tached for the reason that ‘[a] warrant had been issued for his
arrest, he had been arraigned on that warrant before a judge in a …
courtroom, and he had been committed by the court to conﬁne-
ment in jail.” 554 U.S. at 200 (emphasis added); see id. at 200
n.10 (noting “Brewer’s separate, emphatic holding that the ini-
tial appearance marks the point at which the right attaches.”) (em-
phasis added). Or look to the Court’s description of Michigan
v. Jackson, 475 U.S. 625 (1986): “by the time a defendant is
brought before a judicial oﬃcer, is informed of a formally lodged
accusation, and has restrictions imposed on his liberty in aid
of the prosecution, the State’s relationship with the defendant
has become solidly adversarial.” 554 U.S. at 202 (emphasis
added). Even Rothgery’s explanation of when the prosecuto-
rial process has begun is infused with language suggesting
that presence matters: “an accusation ﬁled with a judicial of-
ﬁcer is suﬃciently formal, and the government’s commitment
26 No. 21-3268

to prosecute it suﬃciently concrete, when the accusation
prompts arraignment and restrictions on the accused’s liberty
to facilitate the prosecution.” 554 U.S. at 207 (emphasis
added). It was not unreasonable for the Wisconsin Court of
Appeals to interpret “arraignment” as the defendant’s ap-
pearance before a magistrate. Indeed, Rothgery even deﬁnes
“arraignment” as the “ﬁrst time before a court.” 544 U.S. at
199 (quoting W. LaFave, J. Israel, N. King & O. Kerr, Criminal
Procedure § 1.4(g), at 135 (3d ed. 2007)). Nor was it unreason-
able for the Wisconsin Court of Appeals to conclude that the
Supreme Court meant what it said when it wrote that “a crim-
inal defendant’s initial appearance before a judicial oﬃcer, where
he learns the charge against him and his liberty is subject to
restriction, marks the start of adversary judicial proceedings that
trigger attachment of the Sixth Amendment right to counsel.”
544 U.S. at 213 (emphases added).
 To the majority, the question is whether the Wisconsin
Court of Appeals misunderstood that the right attaches at the
“initiation of adversarial judicial proceedings.” Ante at 17. But
that phrase is hardly self-deﬁning. The majority quotes Roth-
gery for the principle that the initiation of adversarial judicial
proceedings occurs once the government has “used the judi-
cial machinery to signal a commitment to prosecute as spelled
out in Brewer and Jackson.” Ante at 15 (quoting 544 U.S. at
211−12). But both Brewer and Jackson make arraignment—the
“ﬁrst time before a court”—the bedrock of their analysis.
Brewer, 430 U.S. at 398–99; Jackson, 475 U.S. at 629 & n.3. De-
termining when “adversarial judicial proceedings” begin is
diﬃcult. It was not unreasonable for the Wisconsin Court of
Appeals to conclude that Garcia’s absence was material to the
attachment inquiry given the Supreme Court’s case law
No. 21-3268 27

emphasizing arraignment or initial appearance as consistent
with—if not proof of—a commitment to prosecute.
 The majority also quotes the last sentence of Rothgery’s
footnote 9 in service of its holding that a probable cause ﬁnd-
ing that prompts legal action triggers Sixth Amendment at-
tachment. Ante at 16 (quoting 554 U.S. at 199 n.9). Footnote 9
appears at the end of a lengthy sentence highlighting the im-
portance of a defendant’s appearance before a judge:
 This ﬁrst time before a court, also known as the
 “‘preliminary arraignment’” or “‘arraignment
 on the complaint,’” see 1 W. LaFave, J. Israel, N.
 King, & O. Kerr, Criminal Procedure § 1.4(g),
 p. 135 (3d ed. 2007), is generally the hearing at
 which “the magistrate informs the defendant of
 the charge in the complaint, and of various
 rights in further proceedings,” and “deter-
 mine[s] the conditions for pretrial release,” ibid.
 Texas’s article 15.17 hearing is an initial appear-
 ance: Rothgery was taken before a magistrate,
 informed of the formal accusation against him,
 and sent to jail until he posted bail.9
554 U.S. at 199. Footnote 9 reads, in full:
 The Court of Appeals did not resolve whether
 the arresting oﬃcer’s formal accusation would
 count as a “formal complaint” under Texas state
 law. See 491 F.3d, at 298–300 (noting the confu-
 sion in the Texas state courts). But it rightly
 acknowledged (albeit in considering the sepa-
 rate question whether the complaint was a “for-
 mal charge”) that the constitutional signiﬁcance
28 No. 21-3268

 of judicial proceedings cannot be allowed to
 founder on the vagaries of state criminal law,
 lest the attachment rule be rendered utterly
 “vague and unpredictable.” Virginia v. Moore,
 553 U.S. 164, 175 (2008). See 491 F.3d, at 300
 (“We are reluctant to rely on the formalistic
 question of whether the aﬃdavit here would be
 considered a ‘complaint’ or its functional equiv-
 alent under Texas case law and Article 15.04 of
 the Texas Code of Criminal Procedures—a
 question to which the answer is itself uncertain.
 Instead, we must look to the speciﬁc circum-
 stances of this case and the nature of the aﬃda-
 vit ﬁled at Rothgery’s appearance before the
 magistrate” (footnote omitted)). What counts is
 that the complaint ﬁled with the magistrate accused
 Rothgery of committing a particular crime and
 prompted the judicial oﬃcer to take legal action in
 response (here, to set the terms of bail and order the
 defendant locked up).
544 U.S. at 199 n.9 (cleaned up) (emphasis added).
 The majority concludes that the last sentence of footnote 9
means all that counts in determining whether Garcia’s Sixth
Amendment right attached is that the complaint accused him
of a particular crime and prompted legal action in response.
But when read as a whole, another, reasonable reading of
footnote 9 emerges. Footnote 9 speaks to the insigniﬁcance of
how Texas state law deﬁnes “formal complaint” in determin-
ing whether the document ﬁled at Rothgery’s article 15.17
hearing was suﬃciently formal to trigger the prosecutorial
process. It expounded not on the ultimate attachment inquiry,
No. 21-3268 29

but only on one of its component parts—a formal accusation.
In other words, it is at least reasonable to read the last sen-
tence of footnote 9 (in light of the sentences that precede it) as:
What counts as a formal accusation “is that the complaint ﬁled
with the magistrate accused Rothgery of committing a partic-
ular crime and prompted the judicial oﬃcer to take legal ac-
tion in response[.]”
 There are yet more reasons that the Wisconsin Court of
Appeals could have rejected the majority’s selective reading
of footnote 9. If accepted, what happens when a federal crim-
inal complaint is ﬁled? A federal complaint accuses a defend-
ant of committing a particular crime and requires a judge to
issue an arrest warrant—or, to use footnote 9’s terms,
“prompts the judicial oﬃcer to take legal action in response.”
See Fed. R. Crim. P. 3 (“The complaint is a written statement
of the essential facts constituting the oﬀense charged.”) &
Fed. R. Crim. P. 4(a) (“If the complaint or one or more aﬃda-
vits ﬁled with the complaint establish probable cause to be-
lieve that an oﬀense has been committed and that the defend-
ant committed it, the judge must issue an arrest warrant to an
oﬃcer authorized to execute it.”) (emphasis added). If all that
counts in the attachment inquiry is the ﬁling of a complaint
that prompts legal action, the Wisconsin Court of Appeals
might well have concluded that federal defendants not yet in
custody now have the right to counsel. But we rejected that
conclusion in United States v. States: “the mere ﬁling of a fed-
eral criminal complaint does not trigger the right to counsel.”
652 F.3d 734, 741 (7th Cir. 2011) (citing United States v. Boskic,
545 F.3d 69, 83 (1st Cir. 2008), United States v. Duvall, 537 F.2d
15, 22 (2d Cir. 1976) (Friendly, J.), United States v. Alvarado, 440
F.3d 191, 200 (4th Cir. 2006), United States v. Moore, 122 F.3d
1154, 1156 (8th Cir. 1997), United States v. Pace, 833 F.2d 1307,
30 No. 21-3268

1310–12 (9th Cir. 1987), and United States v. Langley, 848 F.2d
152, 153 (11th Cir. 1988)).
 Similarly, the majority draws support from three district
court cases that conclude an ex parte CR-215 proceeding trig-
gers the right to counsel. Ante at 19−20. That other courts
agree with the majority on the merits is not evidence that the
contrary conclusion is unreasonable. Moreover, two of those
cases were federal prosecutions, meaning § 2254(d)(1)’s def-
erential standard of review was not in play. Ante at 19−20 (cit-
ing United States v. West, No. 08-CR-157, 2009 WL 5217976
(E.D. Wis. Mar. 3, 2009) and United States v. Mitchell, No. 15-
CR-047, 2015 WL 5513075 (E.D. Wis. Sept. 17, 2015)). The third
was a civil action against oﬃcers who placed a suspect in a
lineup after an ex parte CR-215 proceeding but before his ini-
tial appearance. Ante at 19-20 (citing Jackson v. Devalkenaere,
No. 18-CV-446, 2019 WL 4415719 (E.D. Wis. Sept. 16, 2019)).
While that court agreed that the right to counsel attached at
the CR-215 proceeding, it granted the oﬃcers qualiﬁed im-
munity because at the time of the lineup “it was not clearly
established that the right to counsel attaches after the commis-
sioner’s probable cause determination.” Jackson, 2019 WL
4415719, at *3. The Jackson court went further still, noting that
the Wisconsin Court of Appeals’ decision that we review to-
day “demonstrates that the moment at which the right to
counsel attaches has been a point of legal debate.” Id. at *3 n.1.
That alone resolves this case.
 To the majority, appearance is irrelevant; a probable cause
ﬁnding that prompts judicial legal action triggers the right to
counsel. Maybe so, but determining whether the Wisconsin
Court of Appeals was correct (a question that I do not answer)
is not our task. Our sole inquiry must be whether any error
No. 21-3268 31

was beyond reason. Against the backdrop laid out above, our
analysis can and should start and stop with the conclusion
that the Wisconsin Court of Appeals’ reliance on the Supreme
Court’s most recent statement of the law and attention to Gar-
cia’s absence was not “so lacking in justiﬁcation that there was
an error well understood and comprehended in existing law
beyond any possibility for fairminded disagreement.” Har-
rington, 562 U.S. at 103. I respectfully dissent.